# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI
# ST. JOSEPH DIVISION

|                              |   |                       |
|------------------------------|---|-----------------------|
| GARY LEON TETER, JR.,        | ) |                       |
|                              | ) |                       |
| Plaintiff,                   | ) |                       |
|                              | ) |                       |
| v.                           | ) | No. 08-6097-CV-SJ-FJG |
|                              | ) |                       |
| GLASS ONION, INC.,           | ) |                       |
|                              | ) |                       |
| Defendant.                   | ) |                       |

## ORDER

Pending before the Court is defendant Glass Onion, Inc.'s ("GOI") Motion for Summary Judgment (Doc. No. 69) and plaintiff Gary L. Teter, Jr.'s Motion for Partial Summary Judgment (Doc. No. 70).

## I.     BACKGROUND

Teter is a renowned artist that paints fine art depicting historic scenes of American frontier life, and sells his work at selected art galleries.  In January 2007, Brad and Diana Walpole, owners of Glass Onion, Inc. ("GOI"), entered negotiations with Jim Sanders, owner of Treasure Palace Ltd. ("TPL") doing business as 83 Spring Street Gallery ("Gallery"), to purchase the Gallery and related assets.  The real estate and asset purchase agreements were contingent, in part, on the Walpole's obtaining a satisfactory agreement with Teter that he would continue his existing relationship with the Gallery.  At the time, Teter sold artwork to TPL for resale at the Gallery, allowed advertisement of his artwork on the Gallery's website and occasionally made personal visits to the Gallery.

## A. Jamesport Meeting

On February 27, 2007, Brad and Diana Walpole met with Lee Teter, his wife Barbara Teter, Teter's daughter Shawnee Herbst and her husband Wyatt Herbst, at Teter's home in Jamesport, Missouri. At the meeting, the parties came to an understanding that Teter's relationship with 83 Spring Street Gallery would continue as it had existed under Jim Sanders' ownership. Teter also informed the Walpoles that Shawnee would soon be joining the "family business," Summer Field Fine Art ("SFFA"), and would handle publication of Teter's work and generally act on his behalf. Any agreement reached between the parties was not reduced to writing. Nonetheless, being satisfied with the outcome of the Jamesport meeting, on March 30, 2007, Jim Sanders and the Walpoles executed the asset purchase agreement and real estate contract, through which GOI purchased the 83 Spring Street Gallery from Jim Sanders, which included the art inventory, the website, domain names and other real and intellectual property associated with TPL's business.

## B. GOI and Teter's Business Relationship

Between May 18, 2007, and February 7, 2008, GOI and Teter entered into approximately eight sales transactions, through which GOI purchased original paintings and prints in various quantities at a time. Teter received payment upon GOI's receipt of the artwork. Each time GOI completed a sales transaction with Teter, GOI posted an image of the newly acquired work on the Gallery's website.

During late Spring 2007, GOI began revamping the Gallery's website. On June 30, 2007, Brad Walpole sent an email to SFFA that stated, "we are about to begin our

website overhaul in earnest. . . . [m]ay we use pictures from your website to display Lee's work that we are carrying?" (Doc. No. 71-12).  Shawnee responded on July 2, 2007, and stated, "I wanted to answer your question about your website makeover: Yes, use any images from Summer Field's website."  (Doc. No. 71-13).

On January 4, 2008, Barbara Teter sent a letter on behalf of Lee Teter to the "Authorized Lee Teter Galleries," including 83 Spring Street Gallery, which informed the dealers of Lee and Barbara Teters' official retirement from the publishing business, and announced that Shawnee and Wyatt Herbst would be taking over SFFA.  On March 27, 2008, SFFA sent a proposed Dealership Agreement to GOI, which included the terms and conditions for becoming an authorized SFFA dealer, including minimum order requirements, assertion of rights over the advertisement of copyrighted material and terms of sale (Doc. No. 69-9).

On April 24, 2008, GOI sent a letter to Shawnee informing that it would not agree to the terms of the proposed Dealership Agreement, as written.  GOI asserted its position that it had an "existing verbal agreement covering our relationship with Summer Field Fine Art," and referred to the February 27, 2007, meeting amongst the parties where Teter agreed that 83 Spring Street Gallery would continue to be an authorized dealer with an exclusive territory that included the State of Arkansas as well as the Branson, Missouri metro area (Doc. No. 69-10).

C.     Events Preceding the Instant Lawsuit

On May 20, 2008, Shawnee sent a letter to Mr. and Mrs. Walpole that "conclude[d] the permissible use of copyrighted images of Lee Teter art," since any use

was a "privilege reserved for Authorized Dealers of Summer Field Fine Art." (Doc. No. 76-17). The letter requested that GOI remove all images of Teter art from any form of advertising, including websites.   SFFA sent GOI a second notice on June 2, 2008, requesting that all copyrighted images be removed from the Gallery's advertising (Doc. No. 76-18).

Following the second notice, GOI temporarily removed the images from the Gallery's website.  On July 7, 2008, GOI sent a letter to Shawnee Herbst stating that, pursuant to the standing agreement with Teter, GOI was well within its legal rights to use "thumbnail" images for the purpose of advertising lawfully owned art, and that GOI would re-display such images on its website with digital watermarks reading "83 Spring Street" to protect Teter from unauthorized copies of the digital images from the website (Doc. No. 69-12). Teter commenced this lawsuit on September 24, 2008, at which time GOI maintained the watermarked images displayed on the Gallery's website.

GOI moves for summary judgment on all of Teter's causes of action, which include: (I) copyright infringement, (II) false designation of origin, (III) unfair competition, (IV) trademark infringement (V) trademark dilution, and (VI) violation of the Visual Arts Rights Act (VARA), 17 § U.S.C. 106A.

Teter moves for judgment as a matter of law on his copyright infringement claim, and on defendant's counterclaims for (I) breach of contract,[1] (II) promissory estoppel,

---

[1]Based on GOI's pleadings, the Court will assume its counterclaims originally styled as "(I) Breach of Contract (the TPL/Teter Agreement)," and "(II) Breach of Contract (Sale of Goods Contracts)," are now consolidated into one general counterclaim for breach of contract.  Defendant's Suggestions in Opposition to plaintiff's Motion for Partial Summary Judgment states, "GOI's motion for summary judgment clearly establishes that the UCC is the controlling substantive contract law . . ." and

and (III) breach of covenant of good faith and fair dealing.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the movant demonstrates that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).  The facts and inferences are viewed in the light most favorable to the nonmoving party.  Fed. R. Civ. P. 56(c); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-590 (1986).  The moving party must carry the burden of establishing both the absence of a genuine issue of material fact and that such party is entitled to judgment as a matter of law. Matsushita, 475 U.S. at 586-90.

Once the moving party has met this burden, the nonmoving party may not rest on the allegations in the pleadings, but by affidavit or other evidence must set forth facts showing that a genuine issue of material fact exists.  Fed. R. Civ. P. 56(e); Lower Brule Sioux Tribe v. South Dakota, 104 F.3d 1017, 1021 (8th Cir. 1997).  To determine whether the disputed facts are material, courts analyze the evidence in the context of the legal issues involved.  Lower Brule, 104 F.3d at 1021.  Thus, the mere existence of factual disputes between the parties is insufficient to avoid summary judgment.  Id. Rather, "the disputes must be outcome determinative under prevailing law."  Id. (citations omitted).    Furthermore, to establish that a factual dispute is genuine and sufficient to warrant trial, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the facts."  Matsushita, 475

_____

does not advance a separate argument in support of the "Breach of Contract (TPL/Teter Agreement") counterclaim.

U.S. at 586.  Demanding more than a metaphysical doubt respects the appropriate role of the summary judgment procedure: "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action."  Celotex, 477 U.S. at 327.

## III.    DISCUSSION

Teter claims copyright infringement in violation of the Copyright Act of 1976, trademark infringement, false designation of origin, unfair competition and trademark dilution under the Lanham Act, and violation of the Visual Artist's Rights Act.  GOI seeks judgment as a matter of law on all of Teter's claims.  Teter seeks summary judgment on his claim of copyright infringement, and on GOI's counterclaims of breach of contract, promissory estoppel and breach of covenant of good faith and fair dealing.

### A.    COPYRIGHT INFRINGEMENT

Teter alleges defendant has "unlawfully reproduced, unlawfully distributed, unlawfully prepared a derivative work of LEE TETER Copyrighted Works, and unlawfully displayed LEE TETER Copyrighted Works." (Doc. No. 1).  Plaintiff adds that both the thumbnails and the higher resolution images displayed on the Gallery website are unauthorized works that infringe upon Teter's copyright ownership rights.

To establish copyright infringement, plaintiff must show:  "(1) ownership and validity of the copyright, and (2) potential violation of the copyright owner's exclusive rights by, for example, unauthorized reproduction and distribution of the copyrighted work."  Pinkham v. Sara Lee Corp, 983 F.2d 824, 830 (8th Cir. 1992).  Here, Teter's

copyright ownership is undisputed; thus, the only issue is whether GOI infringed Teter's exclusive rights under 17 U.S.C. 106 § (1)(2)(3) and (5) to reproduce, prepare derivative works, distribute copies, or display his work publicly.  Section 106(1) grants the copyright owner an exclusive right to reproduce the work in copies, and to authorize such reproductions.  A "copy" is defined as a tangible form or  "material object" in which a work is "fixed by any method now known or later developed," and from which that work "can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 28 U.S.C. §101.

GOI does not dispute that it created digital images of Teter's copyrighted works. Brad Walpole photographed the artwork, reduced the digital image in size and resolution, and uploaded it to the host for display on the Gallery's website, which included thumbnail size and larger, low resolution images.  Thus, creation and storage of the electronic images of Teter's copyrighted works constitute copies within the meaning of the Act.  See Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146,1160 (9th Cir. 2007) ( explaining "[a] photographic image is a work that is 'fixed' in a tangible medium of expression' . . . when embodied (i.e. stored) in a computer's server (or hard disk, or other storage device). The image stored in the computer is the 'copy' of the work for purposes of the copyright law.").

Based on the applicable law and the undisputed facts, Teter has not established that GOI infringed § 106(2) by creating derivative works because the copy images are not an "original work of authorship" that constitute a derivative work under § 101, nor has Teter established that GOI unlawfully distributed copies of the copyrighted work to

7

the public by sale or other transfer of ownership under § 106(3).  There are sufficient

facts in the record, however, to support a finding that GOI infringed Teter's exclusive

rights under 17 U.S.C. § 106(1) and (5) of the 1976 Copyright Act by creating copies

and publicly displaying the copyrighted works on the 83 Spring Street Gallery website.

Finding Teter has established a claim for copyright infringement, the Court considers

GOI's affirmative defenses.

### 1.     Implied License

GOI argues Teter granted an implied license to GOI to use Teter's copyrighted

works for advertising purposes, and, therefore, GOI was within its rights to display the

digital images on the Gallery website.

"A license is a defense to a claim of copyright infringement," Oddo v. Ries, 743

F.2d 630, 634, n. 6 (9th Cir. 1984), and must be affirmatively pleaded.  Fed. R. Civ. P.

8.   While a copyright owner may expressly grant a license to use the copyrighted work,

a nonexclusive implied license can be granted verbally or implied from conduct.  See

Pinkham, 983 F.2d at 831; Melville B. Nimmer & David Nimmer, Nimmer on Copyright

§10.03[A] at 10-36.1 (3d ed. 1995).  "Consent given in the form of mere permission or

lack of objection is also equivalent to a nonexclusive license and is not required to be in

writing."  I.A.E., Inc. v. Shaver, 74 F.3d 768, 775 (7th Cir. 1996).   By granting an implied

license, the copyright owner permits the use of a copyrighted work in a particular

manner.  See id.

While the particular facts of each case are most relevant, an implied license may

be granted when (1) a person (the licensee) requests the creation of a work, (2) the

creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work.  See Effects Associates v. Cohen, 908 F.2d 555, 558-59 (9th Cir. 1990).

GOI claims an implied license existed as early as the Jamesport meeting on February 27, 2007, where Teter agreed to continue his existing relationship with 83 Spring Street Gallery, which, thus far, allowed for the Gallery to display images of Teter's artwork on its website that it lawfully owned and had for sale.  GOI argues Teter granted GOI an implied license because he remained silent and never objected to display of the images on the Gallery's website until GOI refused to sign the SFFA Dealer Agreement.

Teter responds that GOI only had permission to use images from the official SFFA website to use for advertising on the Gallery website, but did not grant GOI permission to create copies of his work for display.  Teter claims he did not know, and had no reason to know, that GOI was creating its own electronic images for use on the Gallery website.  Teter further contends that GOI did not inherit or acquire a right from TPL to create its own electronic images since it was Jim Sanders, the prior owner of the Gallery, who obtained permission to display electronic images of Teter's work on the Gallery's website.

Based on its evaluation of the undisputed facts, the Court finds Teter granted GOI a nonexclusive implied license to display Teter's copyrighted works on the Gallery website.  In so finding, the Court relies most heavily on the third prong of the Effects test, which is Teter's intent pertaining to the display and distribution of Teter's work.

Effects suggests several objective factors to determine whether an implied license exists, including deposition testimony and the delivery of the copyrighted material without warning that its further use would constitute copyright infringement. See Effects, 908 F.2d at 559 n. 6.

The record makes clear that Teter did not restrict the use of the copyrighted works that he sold to the Gallery. When Sanders and the Walpoles entered into an agreement for the sale of 83 Spring Street Gallery, the general understanding that Mr. and Mrs. Walpole would continue to run the Gallery, including the aspects of website advertising, just as Sanders had run the business.[2] At that time, the Lee Teter/SFFA website listed 83 Spring Street Gallery as an authorized dealer and included a direct link to the 83 Spring Street Gallery website. The Gallery's website included the location, history and contact information as well as photo images of the artwork it had for sale. Jim Sanders had previously obtained broad permission from Barbara Teter to operate the website and use images of the artwork for advertising purposes.[3] Teter provided

---

[2]Jim Sanders stated in his deposition:
Q:    When you turned over the keys to Brad and Diana Walpole in late March of 2007, you were selling to them your business, including your Web site, correct?
A:    Yeah.
Q:    In other words, Mr. Sanders, you expected that once they started running 83 Spring Street Gallery, they'd continue to run it essentially as you had before, correct?
A:    Yes.
(Doc. No. 69-2).

[3]Jim Sanders stated in his deposition:
Q:    Sir, before you used images of Lee Teter Art in your advertising, such as on your Web site . . . was your practice to first obtain permission from Teter before using the image?
A:    I do know that I had permission from Barbie to do the Web site to advertise his work . . . I didn't call back each time and ask for permission each month for each specific image. . . .

10

electronic images to Sanders to display on the website; however, Sanders also testified

that he and/or his computer technician created electronic images for a few original

paintings for which Teter did not provide electronic images.[4]   When Sanders informed

Teter that he was going to sell the Gallery, Teter did not request his images be removed

from the website, such that when the Walpole's purchased 83 Spring Street Gallery, its

website included the same Teter images that preexisted the sale.  Teter sold new works

to GOI with the understanding that GOI would advertise the newly acquired piece on its

---

Q:   Sir, did you believe it was necessary to have Teter's permission before
      you could use an image of his artwork in your advertising?
A:   Well, once, yes.  But once the Web site was set up, it was pretty much
      understood, I felt like.  I felt like it was understood that each available print,
      as I bought them, was something that I could place on the Web site.  It
      would be kind of silly not to.  Each new item, as it became available, could
      be advertised in order to sell the piece.
(Doc. No. 76-11)

[4]Jim Sanders testified:
Q:   Sir, when you were using images of Teter artwork for use in your
      advertising, such as on your Internet site, did you obtain the images from
      Teter?
A:   We did have the image available from Barbie that we could put on the
      Web site early so that we could begin letting people know that it was
      coming, and this is a new piece.  I don't know what she sent us, I don't
      know in what form it was sent.  The technological part is out of my
      ballpark.
Q:   So you believe you were using images provided by Teter to use in your
      advertising; is that right?
A:   Uh-huh.  And they sent me some brochures to hand out.
Q:   You were not taking photographs of the Teter work that you had and then
      using those photographs to use in your advertising; is that right?
A:   Well, I had some originals which are one-of-a-kinds that there were never
      any prints made.  And I'm sure those images made it onto the film, and
      probably my Web site. . . . So those images were not provided by the
      Teters.
Q:   Okay.  Do you remember how many originals like that you had?
A:   Well, there's two, and then there may have been another one or two.
      (Doc. No. 76-11).

11

website (Doc. No. 69-8, p. 193).[5]  The record plainly reveals Teter was aware that images of his copyrighted works were displayed on the Gallery's website throughout TPL and GOI's ownership of the Gallery (Doc. No. 69-8).

The U.S. Court of Claims explains that by conveying a copyrighted work to another party with the understanding of how the party intends to use it, a copyright holder conveys an implied license to that use as a matter of law.  See Herbert v. United States, 36 Fed. Cl. 299, 310-311 (1996).  The Court finds Teter granted GOI an implied license to display the copyrighted works for advertising purposes; however, questions remain as to, first, whether the license included permission for GOI to create copies of Teter's copyrighted work for display on the Gallery website, and, second, whether the license to display Teter's work on the Gallery website was revoked.

### (a)    Scope of Implied License

Next, the Court examines the scope of use that Teter granted to GOI through the implied license, and whether GOI had permission to create copies of the copyrighted works for display on the GOI website.

Since a nonexclusive license does not transfer ownership of the copyright from the licensor to the licensee, the licensor can bring suit for copyright infringement if the licensee's use goes beyond the scope of the nonexclusive license.  Effects Assocs., 908 F.2d at 558 n. 5.  Under Missouri law, "[i]t is the actions, and not the intentions or

---

[5]Teter testified:
Q:    You had told them [Brad and Diana Walpole] that they could use your images on
       their Web site; correct?
A:    I gave them permission to.
       (Doc. No. 69-8).

suppositions, of the parties that determine whether or not there is a contract and the terms of the contract." Don King Equipment Co. v. Double D Tractor Parts, Inc., 115 S.W.3d 363, 369 (Mo. Ct. App. 2003) (citing B-Mall Co. v. Williamson, 977 S.W.2d 74, 78 (Mo. Ct. App. 1998)). "The scope of an implied license takes its form from the circumstances and conduct that created them. . . . [t]he core focus lies in determining what scope of the parties' conduct reasonably suggests as the range of permitted use of the licensed rights." Raymond T. Nimmer, Jeff Dodd, Modern Licensing Law, §10:17 (2009). Importantly, intent is not a factor in determining copyright infringement. See Pinkham 983 F.2d at 829 ("The defendant's intent is simply not relevant: The defendant is liable even for 'innocent' or 'accidental' infringements.").

Teter argues GOI exceeded the scope of any license because GOI created its own images of Teter's artwork for display on the Gallery website rather than only using images SFFA supplied or authorized. GOI took photographs of the newly acquired works, uploaded them onto the computer, modied the resolution and uploaded them to the server. Contrary to GOI's fervent assertions, the record does not establish Teter had actual knowledge that GOI created its own copies of Teter's works.

In addition, the parties strongly disagree about the meaning of an email exchange between Brad Walpole and Shawnee pertaining to permission of use. On June 30, 2007, Mr. Walpole sent an email to the SFFA email account regarding the Gallery's website, and asked, "may we use pictures from your website to display Lee's work that we are carrying?" (Doc. No. 71-12). Mr. Walpole maintains he sought permission "as a courtesy," since he believed the permission to display was part of the

ongoing understanding with Teter, and inherent to GOI's responsibility to promote

Teter's artwork.   Shawnee responded via email on July 2, 2007, and stated in relevant

part, "I wanted to answer your question about your website makeover: Yes, use any

images from Summer Field's website."  (Doc. No. 71-13).  Teter maintains the email

merely granted permission to use images from the SFFA website, but did not grant GOI

permission to create and reproduce electronic images of Teter's work.  GOI argues

Shawnee Herbst's email does not exclude use of other images, nor specify that GOI

may only use images from Teter's website.

The record supports the determination that Teter granted GOI an implied license

to display the copyrighted works on the Gallery website, but there are disputed material

facts upon which reasonable jurors may differ in determining whether the license also

permitted GOI to create copies of Teter's works or whether permission to display was

limited to images SFFA and/or Teter supplied to GOI.

 **(b)**  **Revocation of License**

The Court need not determine the definite time when the implied license arose,

yet Teter's permission for use was made clear at the Jamesport meeting on February

27, 2007.  While Teter certainly acceded to GOI's use of the copyrighted works, the

license was not indefinite, and, as such, the Court must determine if and when Teter

revoked the license.

Where no consideration is given, a nonexclusive implied license is revocable.

See Avtec Sys. Inc. v. Peiffer, 21 F.3d 568, 574 n. 12 (4th Cir. 1994) (noting in dictum

that "an implied license is necessarily nonexclusive and revocable absent

consideration"); see also Keane Dealer Services, Inc. v. Harts, 968 F.Supp. 944, 947 (S.D.N.Y 1997) ("If no consideration was given, the license was revocable, and the institution of this lawsuit would constitute revocation.").

Neither party argues that GOI paid money or gave legal consideration for the license- that is, consideration for the specific licensing right to display images of Teter's works on its website; therefore, Teter was free to revoke his consent at any time. The Court finds Teter revoked the license with the May 20, 2008, letter from SFFA to the Walpoles, which unequivocally revoked permission for use of the copyrighted works and directed GOI to remove Teter's copyrighted works from the Gallery's website. Accordingly, any display of Teter's copyrighted work on the 83 Spring Street Gallery website after May 20, 2008, constitutes copyright infringement as a matter of law, absent successful pleading of GOI's remaining affirmative defenses.

### 2. Agreement for the Sale of Goods

GOI contends it had a contractual right under the Uniform Commercial Code (UCC) to the continued use of the copyrighted images on its website and elsewhere.

The UCC is adopted in Missouri through Mo. Rev. Stat. §§ 400, *et seq.* The statute applies to transactions in goods, and goods are defined as "all things which are movable." Mo. Rev. Stat. § 400.2-105(1). Accordingly, artwork is a "good," and the sale of artwork is governed by the UCC. Generally, a contract for the sale of goods must be in writing, but there is an exception for transactions in which payment has been made and accepted, or where goods have been received and accepted. Mo. Rev. Stat. § 400.2-201(3)(c). Thus, an implied contract based on the parties' course of dealing can

arise even though it was not reduced to writing.  See Smith-Scharff Paper Co. v. P.N. Hirsch & Co. Stores, Inc., 754 S.W.2d 928, 930 (Mo. Ct. App. 1998) (finding course of dealing for custom goods over period of 36 years gave rise to implied contract).  An agreement is "the bargain of the parties in fact, as found in their language or inferred from other circumstances, including the course of performance, course of dealing, or usage of trade . . ." Mo. Rev. Stat. § 400.1-201(3).

GOI contends the course of dealing between the parties gave rise to an enforceable agreement that includes permission for GOI to copy and display the Teter works that it lawfully owns on the Gallery's website.  The Court has already found the implied license granted GOI permission to display Teter's copyrighted works; thus, the issue is whether any implied agreement that arose from the sale of goods between Teter and GOI included permission to make copies of those works.

GOI claims an agreement was formed beginning with the events prior to the Walpole's purchase of the Gallery.  The real estate contract between GOI and TPL included a contingency clause that allowed GOI to "obtain satisfactory results with the contractual agreement with the artist[] . . . Lee Teter . . . in the Buyer's sole discretion . . ." prior to executing the contract (Doc. No. 76-16).  Jim Sanders had informed the Walpoles that Teter "did not do business in writing."  (Doc. No. 69-1).  On February 27, 2007, the Walpoles met with Teter at his home in Jamesport, Missouri, to "obtain assurances that [they] would continue with the same rights and privileges and expectations and personal appearances as had occurred with Sanders." (Doc. No. 69-1).  GOI claims Teter unquestionably assured the Walpoles that the same business

relationship would continue under their ownership.

GOI refers to the conduct of the parties subsequent to the February 27, 2007, meeting as evidence that the expected course of performance was realized in fact. After GOI purchased the Gallery, it entered into approximately eight purchase transactions with Teter between May 2007 and February 2008.[6] Teter sent an invoice to GOI for each purchase, and GOI paid the invoice. After each purchase, GOI created an image copy of the newly acquired work and posted it on the Gallery's website. In addition, Teter attended a marketing event at the Gallery in August 2007 for current and prospective clients interested in Teter's work. Teter did not object to the images on the website until SFFA proposed the Dealership Agreement in May 2008, which required GOI to abide by new terms in order to remain an authorized SFFA dealer and be permitted to make use of Teter's copyrighted works. GOI claims the parties' conduct demonstrates Teter and GOI had an agreement that included permission to copy and display Teter's works.

Teter disputes any formal agreement, and further claims that any course of dealing between the parties did not give rise to implied license to reproduce or display the copyrighted works. Teter argues the purchase transactions did not give rise to any enforceable agreement in connection with the use of the copyrighted works, emphasizing that each sale was a single purchase transaction, which did not guarantee any future obligation. The transactions varied in quantity, type of work (i.e. original

---

[6]There is a discrepancy amongst the parties as to the number of purchase transactions. Plaintiff states there were six (6) purchase transactions (Doc. No. 76), whereas defendant states there were eight (8) purchase transactions (Doc. No. 69). For purposes of the Court's analysis, however, the discrepancy is immaterial.

17

painting or prints), and occurred irregularly over a nine-month period. More importantly, plaintiff argues that any implied agreement under the UCC did not include a license to copy Teter's copyrighted works.

The applicable law supports plaintiff's position. Any implied agreement between the parties for the purchase and sale of Teter's artwork did not include a transfer of Teter's exclusive rights under his copyrighted works because the Copyright Act mandates that ownership of the tangible object does not equate to ownership of the exclusive rights of a copyright.

Section 202 of the Copyright Act provides:

> Ownership of a copyright, or of any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied. Transfer of ownership of any material object, including the copy or phonorecord in which the work is first fixed, does not of itself convey any rights in the copyrighted work embodied in the object; nor, in the absence of an agreement, does transfer of ownership of a copyright or of any exclusive rights under a copyright convey property rights in any material object.

17 U.S.C.A. § 202; see also Nika Corp. v. City of Kansas City, Mo., 582 F. Supp. 343, 367 -68 (W.D. Mo. 1983) ("[U]nder both the Federal Copyright Act, 17 U.S.C. §§ 101 *et seq.*, and under the doctrine of "common law copyright" . . . ownership of a copyright is something distinct from ownership of a physical object in which the copywritten work is embodied, so that ownership of one can (and often will) be transferred without transferring ownership of the other.").

Here, it is undisputed that GOI and Teter did not have an agreement that transferred Teter's exclusive rights to copy and publicly display his copyrighted works. Thus, any implied agreement that arose under the UCC as a result of the parties' course of dealing

did not include the exclusive rights to copy or reproduce Teter's copyrighted works.

### 3. Estoppel

GOI argues Teter's conduct bars his copyright infringement claim under the doctrine of estoppel.

A defendant in a copyright infringement case must prove four conjunctive elements to establish estoppel: (1) the plaintiff must know the facts of the defendant's infringing conduct; (2) the plaintiff must intend that its conduct shall be acted on or must so act that the defendant has a right to believe that it so intended; (3) the defendant must be ignorant of the true facts; and (4) the defendant must rely on the plaintiff's conduct to its injury. See Carson v. Dynergy, Inc., 344 F.3d 446, 453 (5th Cir. 2003); see also Hampton v. Paramount Pictures, Corp., 279 F.2d 100, 104 (9th Cir. 1960).

To establish the first element, GOI must show Teter knew of GOI's infringing conduct. Specifically, GOI must show Teter was aware that GOI made electronic copies and displayed images of Teter's copyrighted work on the Gallery website. For the reasons discussed in Section A(1) above, the Court cannot find Teter had full knowledge of GOI's alleged infringing conduct. The record makes clear that Teter knew GOI that displayed images of his artwork on the Gallery's website, but the evidence does not establish Teter knew that GOI was creating its own digital images of the copyrighted work. Thus, there is a triable fact as to whether Teter had full knowledge of GOI's allegedly infringing conduct. As GOI did not establish the first requirement for its estoppel defense, the Court need not proceed to the remaining elements.

### 4. First Sale Rule Defense

GOI argues the first sale rule bars plaintiff's copyright infringement claim because it only uses images of Teter's copyrighted works that GOI lawfully owns.

Under the first sale rule codified in 17 U.S.C. § 109, certain exclusive rights of the copyright owner may be limited. The Copyright Act grants the copyright owner the exclusive rights to distribute copies of the work to the public by sale or other transfer of ownership. 17 U.S.C. § 106(3). The first sale rule terminates this exclusive distribution right with respect to a particular copy of a work that has been lawfully made and sold, and allows the owner of that particular copy to sell or otherwise dispose of it. If, however, the copy being sold was not lawfully made, the first sale rule does not apply.

The first sale rule does not bar Teter's copyright infringement claim because his claim is based on GOI's reproduction and display of Teter's copyrighted works, thus implicating Teter's exclusive rights under §§106 (1) and (5) to copy and publicly display his copyrighted works. Here, application of the first sale rule extends only to Teter's sale of copyrighted paintings and prints to the Gallery for resale, but such transfer is limited to exhaustion of his distribution right under § 106(3).

### 5.    Fair Use Defense

GOI claims Teter's copyright infringement claim is barred because GOI's use of Teter's copyrighted works constitutes fair use.

The fair use doctrine allows courts to avoid rigid application of the copyright statute "when, on occasion, it would stifle the very creativity which that law is designed to foster." Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 575 (1994). The goal of copyright law is to protect the creators' work product in order to encourage and allow the development

of new ideas.  See Perfect 10, 508 F.3d at 1163.  To fulfill this purpose, the fair use defense permits the use of copyrighted works without the copyright owner's permission in certain situations. Fair use may include reproduction in copies for purposes such as criticism, comment, news reporting, teaching, scholarship, or research.  17 U.S.C. § 107. The statute does not set forth an exclusive list of non-infringing uses, and, in fact, the doctrine has been adapted  to fair use of copyrighted material on the internet.  See id. (finding operator's display of thumbnail images of copyright owner's photographs was fair use because thumbnails were tools that enabled users to locate full-sized images).  In determining whether the use made of a work in a particular case is a fair use the factors considered shall include-

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

The Court applies these factors and considers the circumstances of this case in the context of the broader aim of copyright law.  Use of a work may be fair use where its purpose is transformative or supercedes the function of the original work.  GOI's images are not transformative, as they do not alter the original work "with new expression, meaning, or message."  Campbell, 510 U.S. at 579.  Unlike the scenario where a general internet search engine "transforms the [thumbnail] image into a pointer directing a user to

a source of information," GOI's use of the images is limited to an informative and promotional function on the Gallery's website- to show customers the Teter works available at the Gallery. See Perfect 10, 508 F.3d at 1165. The images advertise Teter's works, which is a basic commercial purpose and suggests against a finding of fair use.

The copyrighted paintings themselves are highly creative, thus, they are far removed from the core of intended copyright protection - to develop new ideas for broader utility. See id. at 586. GOI does not curtail the amount or portion of the copyrighted works in use, as its thumbnail images are complete photographs of the paintings. On the other hand, GOI's use of thumbnail images does not create a substitute market for Teter's copyrighted paintings because GOI placed a watermark over the images to protect from unlawful reproduction. Examining these facts within the broader purpose of copyright law, the Court concludes the fair use defense would be misapplied and inconsistent with its purpose.

Based on the foregoing, GOI's motion for summary judgment on Teter's copyright infringement claim is **DENIED**, and Teter's motion for summary judgment on the same claim is **DENIED IN PART**. The Court finds Teter granted GOI an implied license to display the copyrighted works on the Gallery website beginning on or about the Jamesport meeting on February 27, 2007, until SFFA revoked permission via letter on May 20, 2008; however, there is a question material fact as to whether GOI exceeded the scope of the implied license by copying and reproducing Teter's copyrighted works during that period.

In addition, none of GOI's affirmative defenses preclude copyright infringement liability after SFFA revoked the implied license in the May 20, 2008 letter. Accordingly, Teter's motion for summary judgment on copyright infringement is **GRANTED IN PART** for

any use of the copyrighted works after May 20, 2008.

### B.    TRADEMARK INFRINGEMENT

Plaintiff alleges violations of section 43 of the Lanham Act, 15 U.S.C. § 1125(a),

on the grounds of  (1) false designation of origin, (2) unfair competition, and (3)

trademark infringement under both 15 U.S.C. §§ 1114 and 1125, *et seq.*.  Plaintiff also

alleges trademark dilution under the Lanham Act, 15 U.S.C. § 1125(c).

Section 43 of the Lanham Act provides a civil action to:

(1) Any person who, on or in connection with any goods or services, or any
container for goods, uses in commerce any word, term, name, symbol, or device,
or any combination thereof, or any false designation of origin, false or misleading
description of fact, or false or misleading representation of fact, which

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the
affiliation, connection, or association of such person with another person, or as to
the origin, sponsorship, or approval of his or her goods, services, or commercial
activities by another person . . .

15 U.S.C. § 1125(a).

Teter uses the mark "LEE TETER" to identify his works of art, and often in the

form of his signature.  Under 15 U.S.C. §1052(e) federal trademark registration is not

available if the mark "is primarily merely a surname"; however, section 43 grants

protection to qualifying, unregistered trademarks from infringement and unfair

competition.  Everest Capital Ltd. v. Everest Funds Management, L.L.C., 393 F.3d 755,

759 (8th Cir. 2005) (citing Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 767-68

(1992)).  As a preliminary matter, the Court determines whether Teter's unregistered

mark is distinct, and, thus, qualifies for trademark protection under section 43. See

<u>Frosty Treats, Inc. v. Sony Computer Entertainment America, Inc.</u>, 426 F.3d 1001, 1003 (8th Cir. 2005) ("Because none of the marks at issue has been federally registered . . . [plaintiff] bears the burden of establishing that its marks are protectible under trademark law.").

A mark is protected if it falls into one of four categories: (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary or fanciful.  <u>See</u> <u>id.</u> at 1005.  A descriptive mark conveys an "immediate idea of the ingredients, qualities or characteristics of the goods," <u>id.</u> (citing <u>Stuart Hall Co., Inc. v. Ampad Corp.</u>, 51 F.3d 780, 785-86 (8th Cir. 1996)), and is protected only if shown to have acquired a secondary meaning.  <u>Id.</u> "Secondary meaning is an association formed in the minds of consumers between the mark and the source or origin of the product."  <u>Id.</u> (citing <u>Co-Rect Prods., Inc. v. Marvy! Adver. Photography, Inc.</u>, 780 F.2d 1324, 1330 (8th Cir. 1985)).  To establish secondary meaning, Teter must show that LEE TETER identifies his goods and distinguishes them from those of others.  <u>Id.</u>  Teter may prove secondary meaning through circumstantial evidence such as the "exclusivity, length and manner of use of the mark; the amount and manner of advertising; the plaintiff's established place in the market."  <u>Id.</u>

The evidence demonstrates the LEE TETER mark is associated with Teter's works of fine art, which depict scenes of American frontier life, and has acquired secondary meaning by being distinct in their subject matter, style and quality.  The works are distributed nationally, are sought-after by established clients, and have acquired a place in the fine art market.  Teter has set forth sufficient evidence for the

Court to conclude LEE TETER is a sufficiently distinct descriptive mark that has acquired a secondary meaning, and is entitled to protection under the Lanham Act.

### 1.  Claims Under Section 43 of the Lanham Act. 15 U.S.C. § 1125.

The LEE TETER mark appears on the electronic images and other places on the Gallery's website.  Teter alleges GOI's use of the LEE TETER mark constitutes (I) false designation of origin, (II) unfair competition, and (III) trademark infringement in violation of 15 U.S.C. § 1125.

To establish a claim for trademark infringement Teter must show that GOI's use of the LEE TETER mark on the Gallery's website creates a "likelihood that consumers will be confused about the source of the allegedly infringing product." Everest Capital Ltd. v. Everest Funds Management, L.L.C., 393 F.3d 755, 759 (8th Cir. 2005).  The Court considers the following factors to evaluate the likelihood of confusion: (1) the strength of the owner's mark; (2) the similarity between the owner's mark and the alleged infringer's mark; (3) the degree to which the products compete with each other; (4) the alleged infringer's intent to pass off its goods as those of the trademark holder; (5) incidents of actual confusion; and, (6) whether the degree of purchaser care can eliminate any likelihood of confusion which would otherwise exist.  SquirtCo v. Seven-Up Co., 628 F.2d 1086, 1091 (8th Cir. 1980).

In the Eighth Circuit, likelihood of confusion is a finding of fact, and GOI is entitled to judgment as a matter of law only if "there is no legally sufficient evidentiary basis for a reasonable jury to find" that GOI did not infringe upon Teter's mark.  Fed. R.

Civ. P. 50(a)(1).[7]  The strength of the Teter's mark is weak, given that descriptive marks

are entitled to the weakest protection.  First Bank v. First Bank System, Inc., 84 F.3d

1040, 1045 (8th Cir. 1996).  The degree of similarity of the LEE TETER mark weighs

heavily in favor of plaintiff, since GOI uses the identical LEE TETER mark in its

electronic copies.  There is competition between GOI and authorized SFFA dealers who

are permitted to use the LEE TETER mark.  While GOI did not intend to "pass off" its

goods as Teter's, the relevant inquiry is whether GOI intended to pass itself off as an

authorized dealer when, in fact, it was not.

On the other hand, GOI's use of the mark was nominative in that it merely

identified the Teter works, thus, indicating GOI did not possess an intent to confuse the

public.  Importantly, Teter produced no evidence of actual confusion by the consuming

public.  Finally, the Court considers the type of product, its cost, and conditions of

purchase, and finds a typical purchaser of fine art is sophisticated in her ability to

distinguish the origin or source as being a verifiable Teter piece.

Not all use of a trademark constitutes infringement, and defendants argue the

nominative fair use doctrine and the first sale doctrine bar Teter's trademark

infringement claims.  The nominative fair use doctrine protects trademark use "'when

the only practical way to refer to something is to use the trademarked term.'" Century 21

Real Estate Corp. v. Lendingtree, Inc., 425 F.3d 211 (3d Cir. 2005).  For the nominative

fair use doctrine to apply, the "user must do nothing that would, in conjunction with the

---

[7]The Eighth Circuit finds Lanham Act claims appropriate for a jury, stating,
"likelihood of confusion is a finding of fact . . . and properly so, in our view . . . a jury . . .
represents a cross-section of consumers [and] is well-suited to evaluating whether an
'ordinary consumer' would likely be confused."  Everest Capital, 393 F.3d at 762.

mark, suggest sponsorship or endorsement by the trademark holder." New Kids on the Block v. News America Publishing Inc., 971 F.2d 302, 308 (9th Cir. 1992).

The well-established first sale doctrine provides that "resale by the first purchaser of the original article under the producer's trademark is neither trademark infringement nor unfair competition." Sebastian Int'l, Inc. v. Longs Drug Stores Corp., 53 F.3d 1073, 1074 (9th Cir. 1995). The doctrine does not, however, protect "resellers who use other entities' trademarks to give the impression that they are favored or authorized dealers for a product when in fact they are not." Australian Gold, Inc. v. Hatfield, 436 F.3d 1228, 1241 (10th Cir. 2006); see also Prompt Elec. Supply Co., Inc. v. Allen-Bradley Co., 492 F. Supp. 344 (D.C.N.Y. 1980) (finding continued unauthorized use of sign and trademark created a likelihood that public would be confused or deceived into believing distributor was authorized distributor of products where distributorship agreement had been terminated).

The likelihood of confusion factors "do not operate in a mathematically precise formula; rather, we use them at the summary judgment stage as a guide to determine whether a reasonable jury could find a likelihood of confusion." Duluth News-Tribune v. Mesabi Publ'g Co., 84 F.3d 1093 (8th Cir. 1996). The Court finds sufficient evidence of GOI's use of the LEE TETER mark to create the impression in the mind of a consumer that 83 Spring Street Gallery is an authorized dealer of Teter works, when in fact, it is not. GOI uses the LEE TETER trademark in the electronic images of Teter's works, on marketing collateral, and it appears in other places on the Gallery's website. In addition, the "83 Spring Street" watermark on the electronic images could create the impression

83 Spring Street Gallery is an authorized dealer of Teter artwork. Because GOI's use of Teter's mark may create confusion as to the source and affiliation Teter's works and the Gallery, the Court declines to apply the nominative fair use and first sale doctrines to bar plaintiff's claims.

Accordingly, summary judgment is **DENIED** as to Teter's causes of action for false designation of origin, trademark infringement and unfair competition under section 43 of the Lanham Act. 15 U.S.C. § 1125(a).

### 2. Trademark Infringement Under 15 U.S.C. § 1114.

Teter alleges trademark infringement under section 1114 of the Lanham Act, which provides protection from trademark infringement to holders of federally registered trademarks.[8] Section 1052(2) bars federal registration to a mark that "is primarily merely a surname." 15 U.S.C. § 1052(2). It is undisputed that LEE TETER is not a federally registered trademark. Summary judgment is **GRANTED** in favor of GOI with regard to Teter's trademark infringement claim under 15 U.S.C. § 1114.

### C. TRADEMARK DILUTION

Teter alleges trademark dilution in violation of the Lanham Act, 15 U.S.C. § 1125(c). Teter contends GOI's creation and use of digital images of Teter's copyrighted works "will continue to dilute the distinctive quality of LEE TETER Copyrighted Works and diminish and destroy the association of the LEE TETER Copyrighted Works with G.L. Teter." (Doc. No. 1).

---

[8]Section 1114 states, "(1) Any person who shall, without the consent of the *registrant* . . . ." (emphasis added). 15 U.S.C. § 1114.

Dilution concerns "the lessening of the capacity of a famous mark to identify and distinguish the goods or services." Luigino's Inc. v. Stouffer Corp., 170 F.3d 827, 832 (8th Cir. 1999). "Dilution occurs when consumers associate a famous mark that has traditionally identified the holder's goods with a new and different source." Id. To establish a claim for trademark dilution the plaintiff must show that (1) its mark is famous, (2) the defendant began using the mark after plaintiff's mark became famous, and (3) that defendant's mark dilutes the distinctive quality of plaintiff's mark by causing consumers to connect plaintiff's mark with different products. Id.

To show that a mark is "famous" is a rigorous standard. Everest Capital, 393 F.3d at 763. "Dilution is a cause of action invented and reserved for a select class of marks- those marks with such powerful consumer associations that even non-competing uses can impinge their value." Id. The Court is mindful that "fame for likelihood of confusion purposes and for dilution are not the same, and that fame for dilution purposes requires a more stringent showing; dilution fame is an either/or proposition- sufficient fame for dilution either exists or does not exist." 7-Eleven, Inc. v. Lawrence I. Wechsler, 83 USPQ 2d 1715, 1722 (TTAB 2007).[9] In addition, a claim for dilution requires proof of actual dilution. Moseley v. V Secret Catalogue, Inc., 537 U.S. 418 (2003). That is, plaintiff must prove an actual lessening of the capacity of its trademark to identify and distinguish plaintiff's product. Everest 393 F.3d at 763.

---

[9]Whether a mark's fame in a limited or "niche" market is sufficient to prove a claim under section 1125(c) remains unsettled in the Eighth Circuit. See Everest Capital, 393 F.3d at 763 (noting disagreement amongst the circuits, and declining to decide whether a mark's fame in a "niche" market is sufficient to prove a claim under § 1125(c)(1)).

Under current Eighth Circuit law, Teter's mark is not famous within the meaning of the statute to the general consuming public. Further, Teter has offered no evidence of proof of actual dilution as required by Moseley.  GOI has been "using" the Teter mark over a period of years, and in fact helped the LEE TETER mark gain broader recognition.  The Court cannot conceive how GOI's use dilutes the distinctive quality of the mark, as its use is primarily nominative and GOI does not place the mark on products aside from Teter's own artwork.  Because the LEE TETER mark is not famous, and there is no evidence of actual dilution the Court hereby **GRANTS** judgment as a matter of law in favor of defendant on Teter's claim for trademark dilution in violation of 15 U.S.C. § 1125(c).

### D.    VISUAL ARTIST'S RIGHTS ACT

Teter claims GOI's unauthorized display of the "83 Spring Street" watermark over the electronic images of his work distort, mutilate or modify his artwork in violation of the Visual Artist's Rights Act (VARA). 17 U.S.C. § 106A.

VARA was designed to protect the moral rights of artists in their works.  Moral rights protect an artist's interest in the proper use of the artist's name and in maintaining the physical integrity of the artist's work.  Berrios Nogueras v. Home Depot, 330 F. Supp. 2d 48, 50 (D.P.R. 2004).  VARA created a new category of "works of visual art," defined as:

> (1) a painting, drawing, print, or sculpture, existing in a single copy, in a limited edition of 200 copies or fewer that are signed and consecutively numbered by the author, or, in the case of a sculpture, in multiple cast, carved, or fabricated sculptures of 200 or fewer that are consecutively numbered by the author and bear the signature or other identifying mark of the author; or

(2) a still photographic image produced for exhibition purposes only, existing in a single copy that is signed by the author, or in a limited edition of 200 copies or fewer that are signed and consecutively numbered by the author.

17 U.S.C.A. § 101.

A "work of visual art" does not include:

(A)(i) any poster, map, globe, chart, technical drawing, diagram, model, applied art, motion picture or other audiovisual work, book, magazine, newspaper, periodical, data base, electronic information service, electronic publication, or similar publication;

(ii) any merchandising item or advertising, promotional, descriptive, covering, or packaging material or container;

17 U.S.C.A. § 101.

GOI created electronic copies of the Teter artwork for sale in the Gallery and displayed those images on the Gallery's website.  The record provides substantial support that GOI's sole purpose for displaying the images on the Gallery's website was to advertise to potential customers the Teter artwork available at the Gallery.  In maintaining a responsible advertising practice, GOI placed the watermarks over the images to protect from unlawful copying or downloading on the internet.

GOI's electronic images are used for advertising purposes and fall comfortably within the works that are excluded from liability under the VARA.  The VARA does not protect "any merchandising items or advertising" presumably because the intent in such items is to successfully promote the artist, which requires preserving integrity in how the artist's work is portrayed.   See Berrios Nogueras, 330 F. Supp. 2d at 50 ("[T]he rights of attribution and integrity to do not apply to reproduction . . . or other uses of the otherwise protected work when used in connection with those works specifically

excluded from the definition of 'works of visual art' under 17 U.S.C. Section 101."). Because GOI's digital images are not within the definition of a "work of visual art" under the VARA, there is no basis for Teter's cause of action and summary judgment is **GRANTED**.

###    E.    BREACH OF CONTRACT

Turning to GOI's counterclaims, Teter seeks summary judgment on GOI's counterclaim for breach of contract. Teter disputes the existence of any agreement between the parties, much less an enforceable agreement that permitted GOI to indefinitely make use of Teter's copyrighted works. Teter argues the initial meeting with the Walpoles in Jamesport on February 27, 2007, did not conclude in any terms, conditions or obligations by either party to do anything.

GOI maintains that it possesses contractual rights under the UCC to use Teter's images for advertising purposes. GOI contends that an agreement for the sale of goods was formed, based on the agreement reached during the Jamesport meeting where Teter agreed to (1) "show" or participate in joint marketing events, (2) sell art to GOI for resale under the same course of dealing it had with TPL, and (3) provide GOI with geographic exclusivity.

GOI refers to the parties' subsequent conduct as illustration that agreement between GOI existed in fact. The parties' course of dealing was based on approximately eight purchase transactions between May 18, 2007, and February 7, 2008, as described in detail in section A(2). GOI claims Teter breached the existing agreement by revoking GOI's geographic exclusivity, imposing the SFFA dealer

agreement, and revoking GOI's rights to use the copyrighted works when GOI declined to enter into the SFFA dealer agreement.

The "existence of a contract is a jury question only to the extent that the facts surrounding the alleged contract are in dispute; where relevant facts are not in dispute, the existence of a contract is a question of law for the court." O.R.S. Distilling Co. v. Brown-Forman Corp., 972 F.2d 924, 926 (8th Cir. 1992). The UCC encourages contract formation in that "a contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." § 400.2-204(1). Nonetheless, a sale of goods contract under the UCC does not displace principles of the common law of contracts. See Computer Network, Ltd. V. Purcell Tire & Rubber Co., 747 S.W.2d 669, 673 (Mo. Ct. App. 1988); Mo. Rev. Stat. § 400.1-103.

An enforceable contract requires that the parties be (1) competent to contract, (2) be of proper subject matter, (3) have legal consideration, (4) mutuality of agreement and (5) obligation. Id. (citing Bengimina v. Allen, 375 S.W.2d 199, 201 (Mo. Ct. App. 1964)). Thus, the core issue here is whether the parties intended a legally binding agreement to arise from the Jamesport meeting and their subsequent dealings. Because GOI's arguments are premised on the existence of an overarching or ongoing agreement between GOI and Teter, the Court focuses on whether the purported agreement created any future obligation on Teter's part. Simply put, the question is whether the purported agreement is supported by legal consideration.

Consideration is found where both parties have obligated themselves by

mutual promises that impose some legal duty or liability on each promisor.  See

Bengimina, 375 S.W.2d at 202-03.  "If, on the other hand, plaintiffs have not bound

themselves to such an obligation by a promise on their part, there is no legal contract

between the parties because there is a failure of consideration."  Id.  In the realm of the

UCC, where a contract need not be in writing, § 2-201(3)(c), and may arise from the

mere sale of goods, "[t]he essentials to formation of a contract . . . must be gathered

from the intention of the parties as expressed or manifested by their words or acts."

Computer Network, 747 S.W.2d at 675.  Furthermore, "[u]nder the UCC, the ultimate

test of definiteness with respect to the sale of goods is that there be a reasonably

certain basis for giving an appropriate remedy."  Id. at 676.

    According to GOI, the parties reached an agreement at the Jamesport

meeting, and the parties' subsequent conduct confirms the agreement existed.  Any

agreement was not reduced to writing.  Between May 18, 2007, and February 7, 2008,

GOI made approximately eight purchases of Teter artwork.  The purchase transactions

consisted of Teter sending GOI an invoice for the goods sold, GOI would pay the

invoice, and Teter accepted payment.  In themselves, the individual transactions

constitute enforceable contracts for the sale of goods under the UCC because the

conduct of the parties is sufficient to show agreement.  Mo. Rev. Stat. § 2-204(1).  Thus,

for example, if one of the goods was defective or damaged upon receipt, GOI could

enforce its rights for replacement or repair under the contract.

    Based on the undisputed facts, the Court cannot, however, find a broader

enforceable agreement based on the terms alleged by GOI.  The agreement fails for

indefiniteness and lack of consideration.  Even GOI cannot point to a specific obligation that Teter assumed.  Instead, GOI claimed that Teter agreed to "sell art to GOI for resale under the same course of dealing it had with TPL" (Doc. No. 75).  Yet, Teter was under no legally enforceable obligation to continue selling artwork to the Gallery at any point in time, neither under TPL nor GOI's ownership.  Teter could stop selling or refuse to sell a painting to the Gallery if he so chose, and the Gallery would have had no legal recourse to enforce the sale.

The Court finds GOI's claim for breach of contract fails because an enforceable agreement does not exist as a matter of law.  Accordingly, the Court **GRANTS** summary judgment for plaintiff on GOI's counterclaims for breach of contract, and the remaining counterclaims of promissory estoppel and breach of the covenant of good faith and fair dealing, which are premised on the existence of a contract.

## IV.      CONCLUSION

Based on the foregoing, there are triable issues of fact as to whether:

(1) GOI exceeded the scope of the implied license by creating electronic images of Teter's copyrighted works; and,

(2) GOI engaged in trademark infringement under 15 U.S.C. § 1125 by holding itself out as an authorized SFFA dealer after permission for use of the mark had been revoked.

Accordingly, GOI's motion for summary judgment on Teter's claim of copyright infringement is **DENIED**, and Teter's motion for summary judgment on his copyright infringement claim is **DENIED IN PART** as to GOI's use of the copyrighted works prior

to May 20, 2008, and **GRANTED IN PART** as to GOI's use of the copyrighted works after SFFA revoked the implied license on May 20, 2008.

GOI's motion for summary judgment on Teter's trademark infringement claim is **DENIED**, as there is a question of material fact whether GOI's use of Teter's mark created a likelihood of confusion regarding affiliation between Teter and the Gallery.

As to the remaining claims, the Court hereby:

(A)    **GRANTS** GOI's motion as to Teter's trademark infringement claim under 15 U.S.C. § 1114 because Teter is not a registered trademark holder;

(B)    **GRANTS** GOI's motion as to Teter's trademark dilution claim under 15 U.S.C. § 1125(c) because the LEE TETER mark is not famous, and Teter has not set forth any evidence of actual dilution;

(C)    **GRANTS** GOI's motion as to Teter's claim under the Visual Artist's Rights Act, 17 U.S.C. § 106A because GOI's use of Teter's artwork is for advertising purposes, and, thus, is not a protected work of visual art; and,

(D)    **GRANTS** Teter's motion as to GOI's counterclaims for breach of contract, promissory estoppel and breach of the covenant of good faith and fair dealing because any agreement was not supported by legal consideration.

**IT IS SO ORDERED**.

Date: July 12, 2010                     **S/ FERNANDO J. GAITAN, JR.**
Kansas City, Missouri                   Fernando J. Gaitan, Jr.
                                        Chief United States District Judge